The plaintiff, J. Ralph Cole, commenced this civil action, alleging, inter alia, that the defendants Alan E. Lewis and The Kensington Investment Company (KIC) breached the incentive compensation provision of an employment agreement by refusing to provide him with (count I) ten percent of Lewis's equity interest in a commercial real estate venture in the area of downtown Boston long referred to as the "Combat Zone" (Combat Zone project) and (count II) twenty percent of the appreciation of the value of Lewis's equity interest (appreciation amount) in a redeveloped piece of commercial real estate at 93-97 Massachusetts Avenue in Boston (Mass. Ave. property). Following a multiday trial, a jury found for Cole on count II, but not count I. The trial judge then incorporated the jury's findings into a final judgment, dated February 8, 2017, wherein he further declared, with respect to count II and the Mass. Ave. property, that (1) the appreciation amount was to be calculated based on the difference between the "initial value" of Lewis's equity interest taken from immediately before redevelopment and a "comparison value" at the time of the payment to Cole, (2) the amount due to Cole was to be reduced by the net amount of cash Lewis had invested in the property, plus interest (cash investment), and (3) if the parties were unable to agree on the amount of the cash investment, it was to be determined through binding arbitration, as stipulated by the parties during trial. The parties have now filed cross appeals.
For his part, Cole first argues that the judge erred by failing to provide a certain instruction to the jury, thereby necessitating a new trial on count I, the Combat Zone project claim. He further argues that the judge erred, and ignored the unambiguous language of the employment agreement, in allowing Lewis to deduct his cash investment from the appreciation amount due in connection with the Mass. Ave. property. Finally, he maintains the stipulation the parties reached during trial regarding arbitration was not as limited in scope as the judge provided for in the final judgment.[3] Lewis and KIC, in turn, argue that the "comparison value" that should be used to calculate the appreciation amount is not the value of Lewis's equity interest at the time of the payment to Cole, but at the time Cole's employment was terminated (for a second time) in 2013.
We conclude that, while the employment agreement is, in many respects, far from a model of clarity, the provision regarding the appreciation amount due to Cole in connection with the Mass. Ave. property is unambiguous insofar as it requires that the amount to be calculated is based on the difference between the value of Lewis's interest immediately before and after redevelopment and does not allow for the deduction of Lewis's cash investment. We further conclude that the parties intended by their stipulation to submit the calculation of the appreciation amount to binding arbitration before an agreed-upon qualified accountant, assuming, of course, that the parties could not agree on that amount.
Background. The facts developed at trial, and which are material to the issues on appeal, are, in most respects, not in dispute.
1. 1997 employment agreement. In 1997, Lewis hired Cole to serve as president of KIC, an entity Lewis had formed to hold his family's real estate and other assets. The parties formalized their agreement in a written contract, dated September 1, 1997 (1997 agreement). Cole's "principal duty" as president was to develop the Combat Zone project, located on a block in downtown Boston, bounded by Washington, Boylston, and LaGrange Streets, but he was also expected to oversee the redevelopment of other properties in the greater Boston area owned by Lewis and his family. According to the 1997 agreement, the term of Cole's employment would continue until terminated by either party, at any time, and for any reason. The 1997 agreement granted Cole an annual salary of $200,000. He was also eligible to earn or receive several types of "incentive compensation," which were detailed in the lengthy and, at times, disjointed section 8 of the 1997 agreement.
a. Incentive compensation. i. Combat Zone project. The first type of incentive compensation related to Cole's duties regarding the Combat Zone project and entitled him, upon the achievement of certain identified goals, to earn a cash bonus and a percentage of Lewis's limited partnership interest in the project. Specifically, section 8 provided, in pertinent part:
"A principal duty of [Cole] will be to deal with the property in which [Lewis] has a financial interest in the Combat Zone, so-called .... The Combat Zone Properties are owned by two limited partnerships .... The duties of [Cole] with respect to the Combat Zone Properties will include, without limitation, the following:
"(a) Arranging for stabilization and/or an extension of the existing mortgage debt on the Combat Zone Properties during calendar year 1997 owed to Abraham Gossman and/or an entity owned or controlled by him and mortgage debt owed to the Federal Deposit Insurance Corporation. In addition, [Cole] will be expected to negotiate with USTrust so as to separate the debt obligations to USTrust relating to the Combat Zone Properties so that the obligations to that bank of [Lewis] and Stuart Pratt are separated so as not to be cross defaulted or cross collateralized. In addition, [Cole] will be obliged to negotiate payment of outstanding real estate taxes, interest and penalties thereon with respect to the Combat Zone Properties and establish an agreement, to the extent obtainable, for future years with respect to real estate taxes for those properties.
"(b) [Cole] shall communicate with the City of Boston and the Boston Redevelopment Authority for establishment of a Master Plan for development of the properties .... These duties will also include, without limitation, completion of site assemblage and/or site control arrangements for the following sites as may be included in the Master Plan referred to above:
"(1) The Glass Slipper Site - 15 LaGrange Street;
"(2) The China Trade Building located at 651 Washington Street;
"(3) The BRA Out Parcel located on 19 LaGrange Street;
"(4) Air rights above ... 679 Washington Street ....
"These duties will also include negotiation with a joint venture equity partner and/or major anchor tenants ...; and completion of permitting and obtaining zoning and construction approvals under the City of Boston's expedited 'Article 80' large project review process; and obtaining construction financing, closing and initiation of project development.
"(c) Accomplishment of the objectives referred to in Section 8(a) during calendar year 1997, to the satisfaction of [Lewis] will enable [Cole] to qualify for incentive compensation for September 1, 1997 through December 31, 1997, of up to $16,667, the amount to be determined by [Lewis] in his discretion.
"In addition, upon timely achievement of the goals referred to in Section 8(b), [Cole] will be entitled to receive 10% of the limited partnership interest currently owned by [Lewis] in the two foregoing partnerships (the "Lewis Partnership Interests" ), plus eligibility for up to an additional 10% of the Lewis Partnership Interests as determined by [Lewis] in his discretion. It is understood that 'timely' achievement of the foregoing goals does not mean achievement of said goals during calendar year 1997." (Emphases added.)
In this action, Cole claims, in count I, to have earned the nondiscretionary ten percent of Lewis's limited partnership interest in the Combat Zone project. As noted above, however, the jury disagreed.
ii. Future properties. The second type of incentive compensation identified in section 8 entitled Cole "to a 20% equity participation as a limited partner, (or nonvoting member or equity participant ), if the form of entity is other than a limited partnership, in all commercial real estate projects in which [Lewis] may invest subsequent to this date during the term of employment" (emphasis added). While Cole has not asserted a claim under this portion of section 8, it is noteworthy that the potential incentive compensation at issue relative to such "future properties" took the form of an equity interest.[4]
iii. Existing properties. Finally, section 8 provided Cole with the opportunity to receive incentive compensation in connection with the appreciation in value of Lewis's equity interest in "Existing Properties" that had undergone significant redevelopment. Specifically, section 8 contained the following paragraphs, which we refer to as the "appreciation amount paragraphs":
"In the event that an Existing Property is redeveloped so as to make a significant change from the use of said property that existed immediately preceding the development activities, then [Cole] will be entitled to 20% of the appreciation in value of the interest of Lewis in such project in excess of the value of the equity of Lewis in said project immediately preceding the development activities.
"For this purpose, the value of a property shall be five times the average Net Operating Cash Flow of the property for the two full calendar years immediately preceding the development activities. 'Net Operating Cash Flow' shall mean the cash receipts from rent and escalation payments received from such property, less all cash expenditures paid in connection with the ownership and operation of the property (non-cash items to be excluded such as depreciation and amortization) but before debt service and income taxes. Extraordinary items, including but not limited to, insurance proceeds, taking awards, amounts received in litigation other than for rent or escalation payments are to be excluded from Net Operating Cash Flow (collectively 'Extraordinary Items').
"By way of illustration and not limitation, if the value of a property before development activities using the above formula is $2,000,000 and the amount of mortgage debt is $500,000, then in the event of development activities at said property, [Cole] will be entitled to 20% of the appreciation in the value of the interest of Lewis in the applicable property above $1,500,000." (Emphases added.)
The Mass. Ave. property qualified as an "Existing Property." In this action, Cole claims, in count II, that he was entitled to twenty percent of the appreciation amount realized from the redevelopment of that property. As noted above, the jury agreed.
2. First termination of employment. In the first half of 2006, Lewis terminated Cole's employment. At that time, Lewis also put the Combat Zone project on hold, indefinitely. Both actions were precipitated by an increase in the anticipated construction cost for the project, from $103 million to $146 million. The cost increase rendered the project financially unfeasible and, in Lewis's mind, reflected poorly on both Cole's communication and financial skills. As of that time, it is undisputed that (1) Cole had achieved some, but not all, of the section 8(b) milestones required to earn the incentive compensation related to the Combat Zone project, and (2) the Mass. Ave. property had yet to be redeveloped, the prerequisite for any incentive compensation related to that Existing Property. Nonetheless, Cole maintained that his right to earn or receive both types of incentive compensation survived the termination of his employment because the 1997 agreement provided "that the rights and obligations of the parties under this Agreement shall continue following termination, except for the payment of salary, expenses and benefits, and the accrual of vacation time." Ultimately, the jury, in response to two special questions, agreed with Cole and found that he and Lewis intended at the time they entered into the 1997 agreement for those incentive compensation "rights" to survive termination of employment.[5] Lewis and KIC have not appealed from those findings.
3. Redevelopment of Mass. Ave. property. In 2007, approximately one year after the termination of his employment, Cole became a consultant to another Lewis-related entity, focusing on the redevelopment of the Mass. Ave. property, a project he had first worked on in 2004 or 2005. Three years later, in 2010, he returned to KIC as a full-time employee, with a new title, executive vice president of special projects, and under a new agreement (2010 agreement). At that time, he not only continued working on the Mass. Ave. property redevelopment, but also on the Combat Zone project. Whatever rights Cole continued to have under the 1997 agreement were not superseded by the 2010 agreement or the consulting agreements.
In 2012, construction commenced on the Mass. Ave. property, with the existing structure being stripped to its steel frame and then rebuilt. Around the same time, a new tenant, an "upscale" furniture retailer, agreed to lease the entire redeveloped building. The certificate of occupancy for the property, now known as 375 Newbury Street, thereafter issued on July 10, 2014. The jury found that the redevelopment resulted in a significant change in the use of the Mass. Ave. property, such that Cole was entitled under the 1997 agreement to twenty percent of the appreciation in the value of Lewis's interest therein. Lewis and KIC have not appealed from that finding, though, as noted above, they have challenged the "comparison value" the judge included in the final judgment as part of the formula for calculating that appreciation amount.
4. Development of Combat Zone project. According to the terms of the 1997 agreement, Cole was required to achieve the goals set forth in section 8(b) in a "timely" manner to earn the incentive compensation related to the Combat Zone project. The agreement, however, did not define "timely." Lewis testified that he told Cole that he expected the goals to be achieved in two to four years. Cole did not dispute that testimony, though he testified that Lewis never suggested prior to the 2006 termination of Cole's employment that the project was moving too slowly. By the time of the 2006 termination of his employment, several of the section 8(b) goals had been achieved under Cole's leadership: communication with the city of Boston and the Boston Redevelopment Authority (BRA) had resulted in the establishment of a master plan for development of a residential condominium and apartment tower on the property; the various parcels on which the tower would be built had been purchased and otherwise assembled into one lot; and the necessary permitting and zoning and construction approvals had been secured under the BRA's expedited "Article 80" large project review process. However, two goals had yet to be achieved: securing construction financing and a joint venture equity partner.
By the time Cole was rehired by KIC in 2010, the Combat Zone project had been revived and modified.[6] While Cole would proceed to work on the project again, the exact nature and extent of his involvement was disputed at trial. According to Lewis and multiple other witnesses, Cole no longer served as the developer for the project, as he had prior to the 2006 termination of his employment. While Cole had proven skills when it came to interfacing with the BRA and community to secure the necessary permitting and approvals, he did not possess the design, construction, finance, and operational skills needed to lead the development of such a large-scale commercial real estate project. As such, KIC partnered with an outside firm, National Development (ND), to take over as the developer and spearhead efforts to secure construction financing and a joint venture equity partner. ND also brought in another firm, Holiday Fenoglio Fowler (HFF), with specific expertise in arranging financing for such projects. Led by those two firms, construction financing was secured and a joint venture partner was found. While Cole, like others at KIC, assisted in that process, his primary role was to work with the BRA and local community to again secure the necessary permits and approvals for the revived project; Lewis and others acknowledged that Cole successfully fulfilled that role. Cole, meanwhile, did not deny the involvement of ND, HFF, and the other KIC executives. However, he maintained that they were all part of a "team" and that, in some respects, he served as the "quarterback" of that team. In either event, construction on the Combat Zone project, which had become known as The Kensington Tower project, commenced in September of 2011, and the certificate of use and occupancy was thereafter issued on October 1, 2013.
5. Second termination of employment. In 2007 and 2010, Lewis had made two personal loans to Cole, in the principal amounts of $185,000 and $855,038.98, respectively. By 2013, the loans were long overdue and Lewis had been urging Cole to address them for some time, but without success. On June 21, 2013, therefore, Lewis informed Cole that, until he addressed payment of the loans, he could no longer work for KIC. Then, over the ensuing July 4 weekend, Lewis found Cole alone in KIC's offices. The following Monday, July 8, 2013, therefore, Lewis terminated Cole's employment altogether, for a second time.[7] Three weeks later, Cole commenced this action. In response, Lewis countersued on the loans.[8]
Analysis. 1. Missing jury instruction. Cole first argues that he is entitled to a new trial on count I, his claim for incentive compensation in connection with the Combat Zone project, because the judge improperly refused to instruct the jury, in substance, that one party (i.e., Lewis) could not avoid performance of his promise to the other (i.e., Cole) based on the nonoccurrence of a condition precedent (i.e., achievement of all the section 8[b] goals), where he himself had hindered or prevented its occurrence.[9] The argument, however, fails for two reasons.
First, while Cole did submit a written request for such an instruction as part of a larger instruction on the issue of the timeliness of performance, he did not object at either the charge conference, when it was clear that the instruction was not among those the judge proposed to give, or the conclusion of the charge, after the instruction was not provided. In fact, the first time Cole objected was two weeks after final judgment entered, in a motion for new trial. The objection, therefore, was not preserved and has been waived. See Muzzy v. Cahillane Motors, Inc., 434 Mass. 409, 416 (2001) (party may not assign as error failure to give instruction unless he or she both objects before jury retires to deliberate and states distinctly objection and grounds of objection); Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974).
Second, as the judge suggested in his order denying Cole's motion for a new trial, there was no evidence that Lewis hindered or prevented Cole from achieving the section 8(b) goals necessary to earn incentive compensation in connection with the Combat Zone project. In fact, the theory Cole pursued at trial was that he had achieved those goals and earned the right to ten percent of Lewis's equity interest in the project. Even if the objection arguably had been preserved, therefore, we would not conclude that the judge erred in refusing to provide the instruction.[10]
2. Calculation of the Mass. Ave. property appreciation amount. Both Cole and Lewis have raised issues with respect to the formula the judge established in the final judgment for calculating the appreciation amount due to Cole in connection with the Mass. Ave. property. We address those issues in logical order.
a. Deduction of Lewis's cash investment. Cole argues that the judge ignored the plain language of section 8 when he ordered in the final judgment that "[t]he sum otherwise due Cole for his [twenty percent] interest in the appreciation amount shall be reduced by the amount of [Lewis's cash investment] in the Mass. Ave. property, with interest accrued at the rate of [six percent] per annum from the date of each cash investment, less any cash distributed to Lewis in respect of the Mass. Ave. Property." We agree.
The interpretation of the 1997 agreement, including the determination of ambiguity, is a question of law for the court, subject on appeal to de novo review. See, e.g., Balles v. Babcock Power, Inc., 476 Mass. 565, 571 (2017). The rules of interpretation are familiar. We "accord no deference to a party's interpretation of a contract but, rather, will focus on the language of the instrument to effectuate its terms." Id. at 571 n.12.
"The words of a contract must be considered in the context of the entire contract rather than in isolation. When the words of a contract are clear, they must be construed in their usual and ordinary sense, and we do not admit parol evidence to create an ambiguity when the plain language is unambiguous.... [E]xtrinsic evidence may be admitted when a contract is ambiguous on its face or as applied to the subject matter. The initial ambiguity must exist, however. Furthermore, extrinsic evidence cannot be used to contradict or change the written terms, but only to remove or to explain the existing uncertainty or ambiguity."
General Convention of the New Jerusalem in the United States of America, Inc. v. MacKenzie, 449 Mass. 832, 835-836 (2007) (citations omitted). See Bank v. Thermo Elemental Inc., 451 Mass. 638, 648 (2008) ("To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties"). "[A]n ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other." Boazova v. Safety Ins. Co., 462 Mass. 346, 351 (2012), quoting from Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). "Language is ambiguous where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken." Ferri v. Powell-Ferri, 476 Mass. 651, 654 (2017) (quotation omitted).
In section 8 of the 1997 agreement, the following paragraphs, which we refer to as the "cash investment paragraphs," follow immediately after the appreciation amount paragraphs:
"While [Cole] will not be obliged to make any cash investment in the Combat Zone Properties or other real estate investments in which he is entitled to participate under this Agreement, all monies invested by Lewis, directly or indirectly, whether as equity or debt, prior to or subsequent to the date of this Agreement, will be repaid in full before any distribution to [Cole] on a sale, refinancing or other distribution of an Extraordinary Item.
"All cash invested by Lewis, whether as equity or debt, will bear interest at the rate of 6% per annum. Interest will be paid annually before any distribution to [Cole].
"In the event that [Cole] is entitled to a distribution from more than one property under the terms of this Agreement, losses from one or more properties may be set off against amounts to be distributed as to other properties.
"By way of illustration and not limitation, in the event that Lewis makes a commercial real estate investment subsequent to the date of this Agreement of $200,000 with a first mortgage of $800,000, [Cole] will be entitled to a 20% interest as a limited partner, or equity participant, provided that on the sale or refinancing of said project, the $200,000 invested by Lewis, together with any unpaid interest at the rate of 6%, will be paid in full before any distribution to [Cole]. If Lewis has a 50% interest in the project before [Cole]'s participation, then [Cole] will receive a 10% interest, i.e. 20% of the interest of Lewis." (Emphases added.)
Based, at least in part, on these paragraphs, the judge felt obligated to order the deduction of Lewis's cash investment in the Mass. Ave. property, plus interest, from any amount due to Cole for the appreciation amount. It is apparent from the plain language of the agreement, however, that the cash investment paragraphs have no application to the calculation of the appreciation amount.
The cash investment paragraphs open with reference to Cole's "participation" in "real estate investments." They then go on to discuss the deduction of Lewis's cash investments, plus interest, before any "distributions" to Cole, be it annually or upon a sale, refinancing, etc. It is clear from this language that it applies when Cole's right to incentive compensation takes the form of an equity interest. Indeed, the cash investment paragraphs make reference to two types of incentive compensation, in connection with the Combat Zone project and future properties, both of which, as noted above, would take the form of an equity interest, according to the plain language of the agreement. In contrast, the plain language of the appreciation amount paragraphs calls for compensation in the form of a "percentage" of the "value" of Lewis's equity interest, not the formation of an equity interest itself. In other words, the appreciation amount paragraphs provide for the payment of a dollar figure, which represents twenty percent of the difference between the value of Lewis's equity interest in the Existing Property before and after the redevelopment, with those values being calculated using the formula provided. The cash investment paragraphs, therefore, are not applicable to the appreciation amount.
This interpretation is reinforced by the illustrations provided in section 8 in both the cash investment paragraphs and appreciation amount paragraphs. The illustration in the cash investment paragraphs specifically references and requires the deduction of Lewis's cash investment, plus interest at the rate of six percent, before any distribution to Cole in connection with his twenty percent equity interest in a future property. In contrast, the illustration in the appreciation amount paragraphs makes no reference whatsoever to any such deduction. Instead, it simply provides that "if the value of a property before development activities using the [specified] formula is $2,000,000 and the amount of mortgage debt is $500,000, then in the event of development activities at said property, [Cole] will be entitled to 20% of the appreciation in the value of the interest of Lewis in the applicable property above $1,500,000." The illustration, like the balance of the appreciation amount paragraphs, is unambiguous. The provision, therefore, must be enforced according to its terms.
To that end, we strike so much of the final judgment as provides, with respect to count II, that the "sum otherwise due Cole for his 20% interest in the Appreciation Amount shall be reduced by the amount of cash invested by Lewis in the Mass. Ave. Property, with interest accrued at the rate of 6% per annum from the date of each cash investment, less any cash distributed to Lewis in respect of the Mass. Ave. Property (the Cash Investment)."[11]
b. The "comparison value." The judge further provided in the final judgment that in "calculating the Appreciation Amount, the initial value is the Lewis value in the Mass. Ave. Property immediately before its redevelopment and the comparison value is the Lewis value at the time that Cole receives payment for his 20% interest in the Appreciation Amount." Lewis argues, however, that the comparison value should be the value of his interest at the time Cole's employment with KIC terminated for a second time, on July 8, 2013, not the time Cole receives payment for his twenty percent of the appreciation amount. We disagree, although we do conclude that the comparison value established in the final judgment is inconsistent with the plain language of the appreciation amount paragraphs.
Lewis's argument is predicated upon yet another portion of section 8, which provides, in part, that in "the event that [Cole] owns any interest in real estate investments pursuant to this agreement, upon termination of his employment for any reason, all of such interests will be sold by him free and clear of liens to Lewis, or the ownership entity designated by Lewis" (emphasis added). In effect, Lewis argues that Cole would have been required to sell any interest he had acquired in the Mass. Ave. property back to Lewis when he was terminated in 2013, and, thus, the comparison value should be taken at that time. As discussed above, however, the incentive compensation owed to Cole in connection with count II and the Mass. Ave. property redevelopment is not an equity or ownership interest.[12] The provision of section 8 that Lewis relies on, therefore, is wholly inapplicable.
The comparison value established by the judge -- the value of Lewis's interest at the time the payment of Cole's twenty percent interest is made -- also is predicated upon the faulty assumption that the incentive compensation owed to Cole in connection with the Mass. Ave. property redevelopment is an equity or ownership interest. Again, we must interpret "the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose," Gross v. Prudential Ins. Co. of America, 48 Mass. App. Ct. 115, 119 (1999) (quotation omitted), and give preference to an interpretation that gives a reasonable meaning to every provision. See Metropolitan Property & Cas. Ins. Co. v. Fitchburg Mut. Ins. Co., 58 Mass. App. Ct. 818, 822-823 (2003). When so viewed, the language of the appreciation amount paragraphs provides that, just as the initial value is the value of Lewis's interest in the Mass. Ave. property immediately preceding the redevelopment activities, the comparison value should be the value of Lewis's interest immediately following completion of those activities, which, based on the issuance of the use and occupancy permit, occurred on July 10, 2014. And, just as the initial value of the "property shall be five times the average Net Operating Cash Flow[13 ] of the property for the two full calendar years immediately preceding the development activities," the comparison value should be based on five times the average Net Operating Cash Flow of the property for the two full calendar years immediately following completion of the development activities.
c. Arbitration. The sole issue that remains, therefore, is how Cole's twenty percent interest in the appreciation amount is to be calculated. This need not detain us long. For his part, Lewis suggests that he only stipulated to submitting the calculation of his cash investment to arbitration, but, while that was the focus of some of the discussions between the judge and counsel, we do not view the stipulation the parties reached so narrowly. Those discussions took place in the larger context of how the amount due to Cole would be calculated if the jury determined that he was entitled to incentive compensation in connection with either the Combat Zone project and/or the Mass. Ave. property. Accordingly, as per the stipulation of the parties, Cole's interest, including, without limitation, calculation of the initial and comparison values, shall be determined by binding arbitration before a qualified accountant agreed to by both parties, assuming, of course, that the parties cannot reach agreement on the amount due to Cole on their own.
Conclusion. The final judgment dated February 8, 2017, is modified by striking the second, third, and fourth sentences of the paragraph concerning count II, and inserting in their place the following:
"In calculating the Appreciation Amount, the initial value is the Lewis value in the Mass. Ave. Property immediately before its redevelopment and the comparison value is the Lewis value immediately after its redevelopment on July 10, 2014. The initial value of the property shall be five times the average Net Operating Cash Flow, as that phrase is defined in the Employment Agreement dated September 1, 1997, of the property for the two full calendar years immediately preceding the development activities. The comparison value should be five times the average Net Operating Cash Flow, again, as that phrase is defined in the Employment Agreement dated September 1, 1997, of the property for the two full calendar years immediately following completion of the development activities on July 10, 2014. If the parties are unable to agree on the amount of Cole's interest, including, without limitation, calculation of the initial and comparison values, it shall be determined by binding arbitration before a qualified accountant agreed to by both parties."
As so modified, the final judgment is affirmed.
So ordered.
Affirmed

In his complaint, Cole also asserted claims for quantum meruit, fraud, unfair and deceptive trade practices (G. L. c. 93A), estoppel, tortious interference with contractual relations, and breach of the covenant of good faith and fair dealing, which were dismissed on summary judgment. He has not appealed from those rulings.

Under section 8, Cole had no equity participation rights in any future properties to the extent that they were occupied by one or more of the several travel-related businesses owned by Lewis and his family. However, he was entitled to an equity interest in any portion of such a future property that was held for occupancy by third parties other than those travel-related entities.

Lewis and KIC moved for summary judgment on counts I and II, arguing that any such incentive compensation constituted "benefits," which, according to the plain language of the 1997 agreement, did not survive the termination of Cole's employment. The summary judgment judge, however, concluded that the agreement was ambiguous in that regard and that Cole's and Lewis's intent would have to be resolved by a jury. Lewis and KIC have not appealed from that ruling.

The changes, which were made for purposes of improving the economic viability of the project, included moving the on-site parking from underground to above ground and eliminating the condominiums in favor of 100 percent market rate apartments.

Thus, Cole's employment was terminated before either the Mass. Ave. property redevelopment or Combat Zone project were completed.

Lewis secured summary judgment on both of his counterclaims. The trial judge issued a "Final Judgment on Counterclaims," also dated February 8, 2017, by which time Cole owed $396,708.89 plus ongoing interest at the rate of eighteen percent per annum on the 2007 loan, and $1,767,255.21 with ongoing interest at the rate of fifteen percent, compounded annually, on the 2010 loan. Cole has not appealed from that final judgment.

For this proposition, Cole cited Lobosco v. Donovan, 30 Mass. App. Ct. 53, 56 (1991), and Restatement (Second) of Contracts § 245 comment a, illustration 1 (1981).

If there had been any evidence that Lewis hindered or prevented him from achieving the section 8(b) goals, Cole could have argued that to the jury, with or without an accompanying jury instruction. He did not do that.

Taken literally, the judge's order that "[t]he sum due Cole for his 20% interest in the Appreciation Amount shall be reduced by the amount of cash invested by Lewis in the Mass. Ave. Property" (emphasis added) would seem to have the potential to result in Cole never receiving any amount. Accordingly, even if the cash investment were to be deducted (which it is not), it certainly would not come out of the sum due to Cole for his interest.

Lewis's argument is also illogical given that when Cole's employment was terminated in 2013, it was his employment under the 2010 agreement that was terminated, not that under the 1997 agreement. And, of course, Cole had yet to become entitled to incentive compensation related to the Mass. Ave. property redevelopment when his employment under the 1997 agreement was terminated in 2006.

The 1997 agreement defined "Net Operating Cash Flow" as follows:
" 'Net Operating Cash Flow' shall mean the cash receipts from rent and escalation payments received from such property, less all cash expenditures paid in connection with the ownership and operation of the property, (non-cash items to be excluded such as depreciation and amortization) but before debt service and income taxes. Extraordinary items, including but not limited to, insurance proceeds, taking awards, amounts received in litigation other than for rent or escalation payments are to be excluded from Net Operating Cash Flow (collectively 'Extraordinary Items')."